Charles Leon **MANOUS, Surviving Spouse and Personal Representative of the Estate of Carol Ann Manous, deceased, Plaintiff,**

v.

**MYLAN PHARMACEUTICALS INC., Defendant.**

No. CIV–11–1330–R.

United States District Court, W.D. Oklahoma.

Aug. 23, 2013.

Emmanuel E. Edem, L. Mark Bonner, Norman & Edem PLLC, Oklahoma City, OK, for Plaintiff.

Clem C. Trischler, Jason M. Reefer, Pietragallo Gordon Alfano Bosick & Raspanti LLP, Pittsburgh, PA, Jon Epstein, Hall Estill, Oklahoma City, OK, for Defendant.

## ORDER

DAVID L. RUSSELL, District Judge.

This matter comes before the Court on the Defendant's Motion to Exclude the testimony of James Bartling, Pharm.D. and Brief in Support. Plaintiff responded in opposition to the motion. The Court conducted a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), on August 21, 2013. Having considered the parties' submissions and arguments, the Court finds as follows.

■ This Court acts as a gatekeeper with regard to the admissibility of expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir.2004). Rule 702 of the Federal Rules of evidence governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Court must determine whether the proffered expert's opinion will assist the trier of fact, in this case, the jury, in understanding or determining a fact at issue in the case. *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. The Court's analysis is intended to ensure that the expert testimony is both reliable and relevant. *Id.* at 589, 113 S.Ct. 2786. Plaintiff, as proponent of the expert, bears the burden of establishing the foundational requirements for admissibility of his expert's testimony, in this case the testimony of James Bartling, Pharm.D.

■ This case involves the alleged manufacturing defect in a fentanyl transdermal patch distributed by Defendant Mylan Pharmaceuticals. Mrs. Manous died on March 12, 2010, and the medical examiner determined the cause of death was acute fentanyl toxicity.[1] Mr. Manous thereafter filed this lawsuit alleging a products liability claim, whereby he will be required to prove that the Mylan patches at issue herein caused Mrs. Manous' death, that the patches were defective when they left Defendant's control, and that the defect

---

1. No autopsy was performed.

made the patches unreasonably dangerous to Mrs. Manous. *See Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okla. 1974). To that end, Plaintiff retained and listed Dr. Bartling, a pharmacist, as an expert, indicating he "will testify in accordance with his report that the Mylan Fentanyl Transdermal System Fentanyl patches at issue were defective and unreasonably dangerous and caused Carol Ann Manous's death." Doc. No. 36. Defendant challenges Plaintiff's attempt to rely on Dr. Bartling, arguing he is not qualified to provide the testimony Plaintiff contends he will offer, that his opinions are not reliable, and that his opinions are not relevant to this case.

There is no dispute that Dr. Bartling is a licensed pharmacist who serves as the Dean of Admissions for the Mercer University School of Pharmacy and dispenses prescription medication, although not opiates, at a free clinic in Georgia. There is similarly no dispute that this case does not involve the standard of care owed by a pharmacist to a person filling a prescription. Dr. Bartling opines in his report that because of Mrs. Manous' medical history, including a diagnosis of painful multiple sclerosis, that she would be the type of consumer expected to use and be affected by the Fentanyl Transdermal System, that the system was intended to deliver a therapeutic dose of Fentanyl to the patient, and that the evidence establishes that Mrs. Manous was using the system as dispensed. He opines that an end user of the Mylan Fentanyl Transdermal System would not expect death to occur if the patches were used correctly, that Mrs. Manous died despite her proper usage, and that "Mrs. Manous died as a result of the Mylan Fentanyl Transdermal System un-expectedly delivering an overdoes of Fentanyl to Mrs. Manous." Bartling Affidavit, ¶ 35. He opined that the Fentanyl concentration in Mrs. Manous' blood should not have exceeded 10 ng/ml, and that the amount of Fentanyl in her blood postmortem, 28.1 ng/ml, could not be accounted for solely as a result of post-mortem redistribution.

First, the Court finds that Dr. Bartling is not qualified to act as an expert in this matter in the manner Plaintiff seeks to utilize his testimony. Plaintiff correctly contends that Dr. Bartling was not required to have ever designed or manufactured a transdermal delivery system in order to act as an expert in this matter. Be that as it may, however, Dr. Bartling has no background related to any issues relevant in this case. Dr. Bartling admitted that he lacked expertise in the areas of toxicology, the postmortem redistribution of drugs, the design and manufacture of transdermal medication delivery systems, and he could not identify anything in particular that could have been defective with regard to the two patches Mrs. Manous was wearing at the time of her death.[2] Dr. Bartling lacks a background in pharacokinetics or pharmacodynamics. He admits that had has no basis to evaluate the manufacturing process. Bartling deposition, p. 148. In short, from the Court's perspective, Dr. Bartling would perhaps be an appropriate expert to testify regarding the duty of care owed by a pharmacist to a customer. He is not, however, the appropriate expert to opine that the fact that the medical examiner determined that Mrs. Manous' postmortem blood concentration of Fentanyl was 28.1 ng/ml and caused her death was correct, was not based on post-mortem redistribution or that it was the

---

**2.** The patches were not retrieved by the parties prior to being discarded by the medical examiner.

result of a defect in the Mylan Transdermal Fentanyl patches that Mrs. Manous was wearing at the time of her death.

 The Court also finds that there is no method utilized by Dr. Bartling from which it can determine that his testimony is reliable. To determine the reliability of expert testimony, courts assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786.

In *Daubert,* the Court listed four factors that, while not an exclusive list of considerations for a trial court, will often be important in making this assessment: (1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; (4) whether the theory has been accepted in the scientific community.

*Truck Ins. Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1210 (10th Cir.2004) (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.)

From the Court's perspective, there simply is no method or scientific information upon which Dr. Bartling relied that can be assessed by the Court. As noted above, the issues in this case do not involve Dr. Bartling's particular area of expertise. Second, Dr. Bartling's testimony appears to be the product of assuming that because Mrs. Manous' postmortem blood level was 28.1 ng/ml, and because he is aware that this concentration is high, that her death was the result of Fentanyl toxicity which necessarily means the patches were defective. He does not, however, address in any detail the concept of postmortem redistribution, and it appears from the thorough submissions of the Defendant that in this particular realm of pharmacology, that it is generally accepted that there is post-

mortem redistribution of Fentanyl., which he acknowledged and disregarded as possible, without providing any detailed information to support his opinion. Additionally, it does not appear that Dr. Bartling consulted research materials in formulating his conclusory opinions. He believes he referenced Baselt's *Disposition of Toxic Drugs and Chemicals in Man,* but apparently conducted no additional research. Bartling Deposition, p. 47–48. Additionally, he is unaware of any other expert or source that supports his opinion.

Q: [D]o you know anyone that shares your opinion that the Mylan fentanyl patch is defective and unreasonably dangerous?

A: No.

\*　　\*　　\*

Q: Can you identify any health scientist in the world other than yourself who has suggested that it is a valid methodology to reach conclusions on the function of a transdermal delivery device by comparing antemortem blood levels observed in controlled clinical trials to a single postmortem blood specimen?

A: No.

Deposition, p. 91, 100–101. In short, Dr. Bartling's opinion is not reliable, and therefore, the Court finds it is not admissible.

 Finally, the Court finds that Dr. Bartling's testimony is not relevant, and would not aid the jury in any manner. His testimony is based on the finding by the medical examiner that Mrs. Manous succumbed to acute Fentanyl toxicity. He however, has no theory as to how the two patches she was wearing could have become defective. He merely theorizes that because Mrs. Manous' postmortem Fentanyl level was so high, that the patches, had to be defective. He could not identify any

flaw in the manufacturing process that could cause accelerated drug delivery.

Q: What I want to know is that is the—what is the flaw in these two patches that you say caused an increased rate of drug delivery?

A: I don't know what caused it.

\* \* \*

Q: I know you said you didn't see these patches. But identify any flaw that could develop in this process that would cause a passive device that relies on molecular defusion for delivery to suddenly start delivering at a rate four to five times higher. Waht's—What can make that happen?

A: I don't know.

Q: Is there anything that you can— that you can think of?

A: I can't think of any, but there must be.

Bartling Deposition, p. 118–19. This type of testimony will not assist the jury in assessing whether the patches at issue herein were defective, nothing about this testimony has an expert component relevant to the issues herein. Although Dr. Bartling is undoubtedly a qualified expert with regard to certain pharmacy-related issues, he is not a proper expert for this case, having no relevant testimony to offer.

The Court finds that Plaintiff has failed to meet his burden of establishing that the testimony of Dr. Bartling is admissible. As such, Defendant's motion is granted. A separate order addressing Defendant's motion for summary judgment will be issued contemporaneously herewith.